UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 12-10365-GAO

UNITED STATES OF AMERICA

v.

PAUL THOMPSON, JR.,
Defendant.

OPINION AND ORDER
January 13, 2014

O'TOOLE, D.J.

The defendant is charged with unlawfully possessing a handgun after having been previously convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). The defendant has moved to suppress two guns seized by the Boston Police during an automobile stop, as well as some statements made by the defendant.

After an evidentiary hearing, I find the following pertinent facts:

Near the end of their 4:00 p.m. to 11:45 p.m. shift on May 3, 2012, Boston Police officers Paradis, McGrath, and Ryan, working as part of the Youth Violence Strike Force, were patrolling the Dudley Square section of Roxbury in an unmarked police vehicle. The area is regarded by police as a high crime area, especially at that time of night.  A typical investigative technique used by the police in such circumstances is to run a Registry of Motor Vehicles check on the license plate numbers of cars encountered on such patrols to discover any possible outstanding violations of motor vehicle laws. Such a check is accomplished through a mobile data terminal (MDT) located in the police car that is connected to the Registry data base. Applying that technique, Officer McGrath ran a check on the license plate of a PT Cruiser that was in front of

the police car in traffic. A record shows that the inquiry was made at 10:46 p.m. The result was information that the PT Cruiser had an expired inspection sticker. On that basis, the police determined to make a traffic stop of the car. Paradis estimated the car was stopped not more than two minutes after the MDT query, or about 10:48 p.m.

Paradis approached the driver of the PT Cruiser, with McGrath following behind him. Ryan approached the front passenger area of the car. The driver, identified as Felicia Badgett, acknowledged to Paradis that the car's inspection sticker had expired. From the light given off by Paradis's flashlight, McGrath could see that there was a passenger seated in the back right behind the driver. He tapped on the rear door window and the passenger rolled down the window. McGrath saw a young man, eventually identified as Latiek Kindel, seated behind the driver. He also smelled the odor of burnt marijuana. Kindel was moving around in his seat so nervously that McGrath testified his body was shaking. He also was looking not at McGrath but at the front seat passenger, the defendant Paul Thompson. McGrath noticed the young man was not wearing a seat belt, and asked him for identification. (A person not wearing a seat belt can be given a citation for the violation.) McGrath also asked Kindel if he had any marijuana, thinking that might explain his nervousness. Kindel replied he did not, though he acknowledged having smoked some earlier.

On the other side of the car, Ryan spoke through an open window to Thompson. Ryan also smelled burnt marijuana, and he similarly asked Thompson if he had any in his possession, which Thompson denied. Thompson was also unbelted, and Ryan asked him for his identification, which he supplied. Unlike Kindel, Thompson did not appear unduly nervous, but rather sat looking down at the floor of the car.

Paradis returned to the police car to run a check on both Kindel and Thompson for any relevant police information, including possible outstanding issues such as warrants. There were no warrants, but for each man there was a criminal history containing a significant number of arraignments. In addition, Ryan told the other officers that he was aware Kindel had been associated with gangs and guns in the past. This information, coupled with the olfactory evidence of prior marijuana use, led the officers to decide to "pat frisk" the car. To that end, the officers asked the occupants of the car to step out, and they each did so without incident, except that Kindel expressed some verbal opposition. When they were outside the car, Thompson and Kindel were each given a bodily pat frisk for possible weapons; there were none. The police did not pat frisk Ms. Blodgett, consistent with policy generally requiring a female officer to do that.

McGrath entered the rear driver's side passenger area of the car where Kindel had been seated and conducted a search for a weapon or contraband, finding neither. Ryan did the same with the front seat passenger area, where he found a handgun in a compartment under the passenger seat. While McGrath and Ryan were both still inside the car, and the car's occupants outside on the sidewalk, Ryan told McGrath in a low tone that he had found a gun. The two officers agreed that the occupants should be handcuffed.  As Ryan approached Thompson and grabbed one of his arms to accomplish the cuffing, Thompson volunteered, "It's mine." At this point, nothing had been said outside the car about a gun. Ryan asked Thompson for his license to carry a firearm, and Thompson admitted he had none. Ryan thereupon read him his Miranda rights. Thompson thereafter made a couple of more admissions, including that "They're both mine," even though the police had at that point found only a single gun. A second hidden gun was later found in the car by a detective.

Paradis called to police dispatch to ask for backup. A second call was made to a supervising sergeant to ask that he come to the scene. According to records pertaining to dispatch tapes, those calls were made respectively at 11:00:41 and 11:01:18 p.m., or approximately 15 minutes after McGrath had first queried the PT Cruiser's license plate.

On these facts, I make the following conclusions and rulings:

The defendant, as a passenger in the vehicle with no demonstrated possessory interest in it, lacks standing to challenge the search of the vehicle as such. See United States v. Symonevich, 688 F.3d 12, 21 (1st Cir. 2012). Apparently recognizing that, he rather argues that the police unlawfully detained him beyond the time reasonably necessary to complete a lawful traffic stop for an out-of-date inspection sticker. Consequently, he asserts, the statements that followed were fruits of that illegal detention. The defendant does have standing to make this challenge. See United States v. Woodrum, 202 F.3d 1, 5-6 (1st Cir. 2000) ("It is doctrinal bedrock that a police stop of a moving vehicle constitutes a seizure of the vehicle's occupants and therefore comes within the purview of the Fourth Amendment. This principle applies equally to drivers and passengers. Hence, each occupant of a car has a right to challenge the propriety of a traffic stop under the Fourth Amendment.") (internal quotations omitted). However, "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." Arizona v. Johnson, 555 U.S. 323, 333 (2009).

The defendant does not argue that the initial stop of the vehicle was invalid. Rather, he contends the police unreasonably extended the duration of the traffic stop, the delay giving them the time and opportunity to find a basis for searching for evidence. The government argues that there was no unreasonable delay under the circumstances.

The time stamps for the MDT inquiry and the dispatch calls indicate that the entire stop took only about fifteen minutes. Even if the two systems were not perfectly coordinated as to their clocks, any likely variance would have been only a few minutes. All other considerations aside, this was not a lengthy detention.

The defendant's insistence that the stop was only a traffic stop that the police unreasonably drew out is wrong. What began as a traffic stop became something else when police detected the odor of smoked marijuana. Once that occurred, the police were entitled to diligently pursue whether an offense had occurred, evidence of which might be found in the car. See Flowers v. Fiore, 359 F.3d 24, 30-31 (1st Cir. 2004). See also United States v. Staula, 80 F.3d 596, 602-03 (1st Cir. 1996).

 "[R]eview of a Terry stop involves a two-step analysis. First, we ascertain whether the stop was justified at its inception. Second, we determine whether the actions undertaken during the stop were reasonably related in scope to the stop itself unless the police had a basis for expanding their investigation." United States v. Mouscardy, 722 F.3d 68, 73 (1st Cir. 2013). Here the detection of the marijuana odor alone, and also when coupled with information about the criminal histories of Thompson and Kindel, gave the police a basis from expanding their investigation from a minor traffic violation to something potentially more serious. The length of the detention was not unreasonable in the circumstances.

The defendant's Motion to Suppress Firearms and Statements (dkt. no. 68) is DENIED.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge